No. 23-1717

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

MARK MCEVOY *et. al*, individually and on behalf of a proposed class,
*Plaintiffs-Appellees*,

v.

DIVERSIFIED ENERGY COMPANY, PLC *et al.*,
*Defendants-Appellants*
_____
On Appeal from the United States District Court
for the Northern District of West Virginia
No. 5:22-cv-00171
_____

_____

**RESPONSE BRIEF OF PLAINTIFFS-APPELLEES**
_____

John W. Barrett,                    Benjamin Luckett
Leslie A. Brueckner                 Amanda Demmerle
J. Lincoln Wolfe                    J. Michael Becher
BAILEY & GLASSER, LLP              Appalachian Mountain Advocates
209 Capitol Street                  P.O Box 407
Charleston, West Virginia 25301     Lewisburg, WV 24901
(304) 345-6555                      (304)873-6080

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1717    Caption: Mark McEvoy, et al. v. Diversified Energy Company PLC, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Mark McEvoy, James Tawney, Susan Tawney, Samuel Stark, Susan Dennison, Mark Goff, Carol DelRosso, George DelRosso,

(name of party/amicus)

Benjamin Patterson, Chad Silvester, Clinton and Candace Drainer Irrevocable Trust, Eben Fritts, Eben Fritts, III, Heidi Deem, Jeffrey L. Saltis, Kellie D. Saltis, Lane Evans, Minerva Evans, Maynard Tanner, Jennifer Tanner, Joan Medley, Jacob Collette, Regina Collette, Scott Corcoran, Kathy Johnson, and Christine Cochran

who is _____ Appellees _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/John W. Barrett                     Date: _____07/26/2023_____

Counsel for: Appellee

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………...i

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ................................................................................................. 1

JURISDICTIONAL STATEMENT .................................................................... 5

STATEMENT OF THE CASE.............................................................................. 7

    I.  Diversified's Limited Right to Use Surface Owners' Properties and Common Law Obligation to Plug Non-Producing Wells ................................. 7

    II. Diversified's Statutory and Regulatory Well-Plugging Obligations ............. 10

    III. The Consent Order Between Diversified and WVDEP................................. 14

    IV. Plaintiffs' Claims and Relief Sought ......................................................... 16

        1. Tort Claims.......................................................................................... 16

        2. Fraudulent Transfer Claims................................................................. 19

    V.  Proceedings Below ...................................................................................... 21

SUMMARY OF ARGUMENT ............................................................................ 26

STANDARD OF REVIEW ................................................................................. 29

ARGUMENT ....................................................................................................... 30

    I.  Governing Legal Standards Under Rule 19................................................... 30

    II. The District Court Did Not Abuse Its Discretion When Finding That WVDEP Is Not a Necessary Party Under Rule 19(a). ................................................ 31

        1. The District Court Can Award Complete Relief to Plaintiffs in the Absence of WVDEP............................................................................................. 32

        2. Awarding Plaintiffs the Requested Relief Would Not Impair or Impede WVDEP's Interests. ............................................................................ 36

i

3.  Granting Plaintiffs' Requested Relief Would Not Impose Inconsistent
    Obligations on Defendants. ............................................................47

III. The District Court Did Not Abuse Its Discretion When Refusing to Dismiss
    Plaintiffs' Claims Under Rule 19(b)...............................................49

CONCLUSION .......................................................................................54

# TABLE OF AUTHORITIES

**Cases**

*A123 Sys., Inc. v. Hydro-Quebec*, 626 F.3d 1213 (Fed. Cir. 2010) ........................52

*Alto v. Black*, 738 F.3d 1111 (9th Cir. 2013) ............................................................7

*Andrews v. Antero Res. Corp.,* 828 S.E.2d 858 (W. Va. 2019) ................................8

*Atkinson v. Va. Oil & Gas Co.*, 79 S.E. 647 (W. Va. 1913) ............................ 17, 19

*Balt. Neighborhoods, Inc. v. LOB, Inc.*, 92 F. Supp. 2d 456 (D. Md. 2000) ..........33

*Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) ..........................................................25

*Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty.
    v. California*, 547 F.3d 962 (9th Cir. 2008) ("*Cachil*") .............. 36, 37, 41, 42, 49

*Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004) ............................................7

*Citizens for a Better Env't-Cal. v. Union Oil Co. of Cal.*, 861 F. Supp. 889
    (N.D. Cal. 1994), *aff'd*, 83 F.3d 1111 (9th Cir. 1996) .................................. 22, 42

*Cnty. of Brunswick v. Lexon Ins. Co.*, No. 7:09-CV-60-BO,
    2010 WL 11565094 (E.D.N.C. Feb. 8, 2010) .......................................................36

*Coastal Modular Corp. v. Laminators, Inc.*, 635 F.2d 1102 (4th Cir. 1980) ..........48

*Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949) ...................................5

*Coleman by Lee v. Stanziani*, 735 F.2d 118 (3d Cir. 1984)) .....................................5

*Collins v. Gen. Motors Corp.*, 101 F.R.D. 1 (W.D. Pa. 1982) ................................54

*Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140 (10th Cir. 2011) ......................5

*Defs. of Wildlife v. Andrus*, 77 F.R.D. 448 (D.D.C. 1978) ....................................51

*Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affs.*,
    932 F.3d 843 (9th Cir. 2019) ...............................................................................52

*EQT Prod. Co. v. Crowder*, 828 S.E.2d 800 (W. Va. 2019) ....................................8

*Ex parte HealthSouth Corp.*, 974 So. 2d 288 (Ala. 2007) .....................................35

iii

*Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368 (1981) ................................6

*Florida Wildlife Federation v. U.S. Army Corps of Engineers*,
   859 F.3d 1306 (11th Cir. 2017) ...................................................... 45, 46

*Francis O. Day Co., Inc. v. West Virginia Reclamation Bd. of Review*,
   424 S.E.2d 763 (W. Va. 1992)..............................................................37

*Francis Oil & Gas, Inc. v. Exxon Corp.*, 661 F.2d 873 (10th Cir. 1981)......... 30, 32

*Gensetix v. Board of Regents of the University of Texas System*,
   966 F.3d 1316 (Fed. Cir. 2020) ............................................................51

*Hayes, Tr. for Paul B. Hayes Fam. Tr., Dated Apr. 30, 2010 v. Bernhardt*,
   499 F. Supp. 3d 1071 (N.D. Okla. 2020)..............................................51

*Hedrick v. Grant Cnty. Pub. Serv. Dist.*, 550 S.E.2d 381 (W. Va. 2001) ..............40

*Hench v. Pritt*, 57 S.E. 808 (W. Va. 1907) ...........................................................9

*Hood v. City of Memphis*, 570 F.3d 625 (5th Cir. 2009) ........................................29

*Kamhi v. Cohen*, 512 F.2d 1051 (2d Cir. 1975) ....................................................49

*Key Constructors, Inc. v. Harnett Cnty.*, 315 F.R.D. 179 (E.D.N.C. 2016)............32

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)................................................................32

*Lee v. Anthony Lawrence Collection, L.L.C.*, 47 F.4th 262 (5th Cir. 2022),
   *cert. denied*, 143 S. Ct. 1054 (2023)...................................................52

*Mountain Valley Pipeline, LLC v. McCurdy*, 793 S.E.2d 850 (W. Va. 2016) ..........9

*N. Arapaho Tribe v. Harnsberger*, 697 F.3d 1272 (10th Cir. 2012) ......................52

*New Orleans Pub. Serv. Inc. v. Council of New Orleans*, 491 U.S. 350 (1989) .....25

*Northrop Corp. v. McDonnell Douglas Corp.*,
   705 F.2d 1030 (9th Cir. 1983) ....................................................... 37, 50

*Occupy Columbia v. Haley*, 738 F.3d 107 (4th Cir. 2013).......................................5

*Ohio Valley Env't Coal., Inc. v. Maple Coal Co.*, 808 F.Supp.2d 868
   (S.D. W.Va. 2011) ................................................................................48

*Ostrzenski v. Seigel,* 177 F.3d 245 (4th Cir. 1999)..................................................29

*Owens-Illinois, Inc. v. Meade*, 186 F.3d 435 (4th Cir. 1999)............................ 30, 31

*Price v. Boone Cnty. Ambulance Auth.*, 337 S.E.2d 913 (W. Va. 1985)................40

*Price v. J & H Marsh & McLennan, Inc.*, 493 F.3d 55 (2d Cir. 2007) ....................5

*Reed v. Phillips*, 452 S.E.2d 708 (W. Va. 1994) .....................................................18

*Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008) ......................... 49, 52, 53

*Runkle v. Genesis Worldwide II, Inc.*, 143 F. App'x 515 (4th Cir. 2005) ................5

*Sabine Pipe Line, LLC v. A Permanent Easement of 4.25 +/- Acres of Land
   in Orange Cnty., Texas*, 327 F.R.D. 131 (E.D. Tex. 2017) .................................52

*Schutten v. Shell Oil Co.*, 421 F.2d 869 (5th Cir. 1970)..........................................31

*Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002) .................................................32

*State ex rel. Bell Atl.-W. Va., Inc. v. Ranson*, 497 S.E.2d 755 (W. Va. 1997) ........40

*Teamsters Loc. Union No. 171 v. Keal Driveaway Co.*, 173 F.3d 915
   (4th Cir. 1999).......................................................................................................30

*Tillman v. City of Milwaukee*, 715 F.2d 354 (7th Cir. 1983)...................................36

*Two Shields v. Wilkinson*, 790 F.3d 791 (8th Cir. 2015) …………………………52

*United States v. Atlantic Wood Industries*, 330 F.R.D. 435 (E.D. Va. 2019) .........47

*United States v. Jefferson Elec. Mfg. Co.*, 291 U.S. 386 (1934) .............................38

*United States v. Sweeny*, 418 F. Supp. 2d 492 (S.D.N.Y. 2006) ...................... 29, 31

*W. Virginia Off. of Miners' Health, Safety & Training v. Beavers,*
   874 S.E.2d 726 (W. Va. 2022)..............................................................................37

*Weinberger v. Romero-Barcelo*, 102 S. Ct. 1798 (1982) ........................................34

*White v. Univ. of California*, 765 F.3d 1010 (9th Cir. 2014)...................................52

*Whiteman v. Chesapeake Appalachia, LLC*, 729 F.3d 381
   (4th Cir. 2013)................................................................................. 9, 10, 18, 40

*Wiggins v. Eastern Associated Coal Corp.*, 357 S.E.2d 745 (W. Va. 1987)...........22

*Wilson Advisory Comm. v. Bd. of Cnty. Comm'rs*, 292 P.3d 855 (Wyo. 2012)......13

*Yashenko v. Harrah's NC Casino Company*, 446 F.3d 541 (4th Cir. 2006)...........46

**Statutes**

Ala. Code § 8-9A-1 et seq...........................................................................19

Ala. Code § 8-9A-4....................................................................................19

Ala. Code § 8-9A-5....................................................................................19

Ala. Code § 8-9A-7....................................................................................35

Ala. Code § 8-9A-7(a)................................................................................19

Ala. Code § 8-9A-7(a)(3)(b).......................................................................20

Ala. Code § 8-9B-1 et seq...........................................................................19

Ala. Code § 8-9B-5....................................................................................19

Ala. Code § 8-9B-8....................................................................................35

Ala. Code § 8-9B-8(a)(1)............................................................................19

Ala. Code § 8-9B-8(a)(3)(ii).......................................................................20

W. Va. Code § 22-10-2(a)(1)................................................................ 11, 43

W. Va. Code § 22-10-2(b) ................................................................. 10, 38, 43

W. Va. Code § 22-10-11(a)................................................................. 3, 17, 40

W. Va. Code § 22-6-19 ....................................................................... 11, 38, 39

W. Va. Code § 22-6-23 ............................................................................ 11, 13

W. Va. Code § 22-6-24 ....................................................................... 11, 13, 43

W. Va. Code § 22-6-28(a)...................................................................... 21, 53

W. Va. Code § 22-7-4(a)..................................................................... 3, 16, 40

W. Va. Code § 22-7-8 ................................................................ 3, 17, 40

**Regulations**

W. Va. Code St. R. § 35-4-10 ................................................ 21, 35

W. Va. Code St. R. § 35-4-13.7 ........................................................33

W. Va. Code St. R. § 35-4-13.8 .................................... 13, 33, 42, 48

W. Va. Code St. R. § 35-5-1 *et. seq.*..............................................38

W. Va. Code St. R. § 35-5-1.1 ........................................................12

W. Va. Code St. R. § 35-5-2.2 ........................................................11

W. Va. Code St. R. § 35-5-3 ..........................................................12

W. Va. Code St. R. § 35-5-4 ..........................................................12

W. Va. Code St. R. § 35-5-4.1 ........................................................12

W. Va. Code St. R. § 35-5-5 ..........................................................12

W. Va. Code St. R. § 35-5-5.6 ........................................................11

W. Va. Code St. R. § 35-6-3 ................................................ 21, 35

W. Va. Code St. R. § 35-6-3.1.c ......................................................9

W. Va. Code St. R. § 35-6-7 ..........................................................38

**Constitutional Provisions**

W. Va. Const. Art. III, §9 ..............................................................9

**Rules**

Fed. R. App. P. 21(a) ....................................................................7

Fed. R. Civ. P. 19 ........................................................................4

Fed. R. Civ. P. 19(a).......................................... 28, 30, 31, 49

Fed. R. Civ. P. 19(a)(1)(A) ................................................ 30, 36

Fed. R. Civ. P. 19(a)(1)(B) .................................................................. 31, 36

Fed. R. Civ. P. 19(a)(1)(B)(i)........................................................... 27, 47

Fed. R. Civ. P. 19(a)(1)(B)(ii)....................................................... 28, 47, 49

Fed. R. Civ. P. 19(b) ............................................... 28, 29, 31, 49, 50

**Other Authorities**

3A *Moore's Federal Practice* ¶ 19.07[2.-0], at 19-99 (2d ed. 1986).......................36

## INTRODUCTION

This action seeks to vindicate the common law property rights of thousands of West Virginia landowners whose surface properties are burdened with Defendant/Appellant Diversified's gas wells, many of which are leaking or otherwise in derelict condition.[1]

Defendants' contention that Plaintiffs' lawsuit must be dismissed because the West Virginia Department of Environmental Protection ("WVDEP") cannot be joined is contrary to well-established West Virginia law, which expressly preserves the common law remedies that Plaintiffs pursue. The position that Defendants and WVDEP stake out in their briefs would impermissibly deprive West Virginians of longstanding, fundamental property rights.

*****

Diversified is the largest owner of natural gas wells in the United States. It owns more than 20,000 gas wells in West Virginia. Each of those carries with it an obligation to plug and remediate the surface property when the well stops producing, under both West Virginia's common law and its statutory oil and gas laws.

_____

[1] Plaintiffs use "Diversified" as shorthand for all entities within the Diversified corporate umbrella. *See* Def. Br. 10 n.1.

1

In 2018 and 2020, Diversified acquired approximately 12,000 mostly nonproducing or low-producing wells from Defendant EQT, the largest producer of natural gas in the United States, in exchange for nearly $700 million.[2] Diversified purchased these wells with full knowledge of its obligations to plug them, but with no intention to do so. Diversified is essentially engaged in a Ponzi scheme—it is burdened with remediation liabilities that greatly exceed its assets, holding billions of dollars' worth of obligations in the form of unplugged gas wells that will remain abandoned long after insiders and investors pull the remaining capital from the company. Diversified maintains the appearance of solvency only by buying additional wells, which provides a short-term influx of cash, and by pushing its liabilities off far past the assets' useful lives. The evidence in this case will show that Diversified's business model is to squeeze short-term profits from the relatively small number of still-producing wells it acquires, while essentially ignoring the rest.

Diversified's scheme involves a gamble that no one will demand performance of its full plugging obligations because no one—including WVDEP—ever has before. Indeed, as explained in further detail below, following its purchase

_____

[2] Plaintiffs use "EQT" as shorthand for all entities within the EQT corporate umbrella. *See* Def. Br. 10 n.2.

of the 12,000 EQT wells in 2018, Diversified sought and received WVDEP's assurance, in the form of an administrative consent agreement (the "Consent Order"), that the agency would not use its regulatory authority under the oil and gas laws to require the plugging of all of Diversified's abandoned wells. Defendants now wrongly argue that this Consent Order—which was issued at Diversified's behest—relieves Diversified of any responsibility to plug its abandoned wells, including its duties under West Virginia common law—even though West Virginia's oil and gas laws expressly and repeatedly *preserve* common law claims such as those asserted in this case.[3]

In a series of orders issued in response to Defendants' three separate motions seeking dismissal, the district court agreed that Plaintiffs' tort claims and fraudulent transfer claims do *not* interfere with the regulatory authority of WVDEP. The Consent Order cannot, under unambiguous West Virginia law, nullify Plaintiffs' property rights. That is because the Consent Order cannot grant to Diversified property rights that the company does not have: specifically, the right to indefinitely occupy Plaintiffs' surface land with abandoned wells. Indeed,

---

[3] *See* W. Va. Code § 22-7-4(a); *see id*. § 22-7-8 ("The remedies provided by this article shall not preclude any person from seeking other remedies allowed by law."); *id.* § 22-10-11(a) (describing statutory remedies as "additional and cumulative" and explaining that "nothing herein contained shall abridge or alter rights of action or remedies now or hereafter existing"); *id*. § 22-7-1(a)(2).

the Consent Order does not purport to supersede Plaintiffs' property rights. The Consent Order is strictly a covenant between WVDEP and Diversified whereby WVDEP agreed not to exercise *its own statutory enforcement authority* as long as Diversified complies with the terms of the Order. Both parties to that agreement thus retain the benefit of their bargain, regardless of Plaintiffs' claims.

Further, as the district court recognized, Plaintiffs' request for money damages, if granted, would not force WVDEP to take any action whatsoever. If Plaintiffs prevail, the agency would not be required to transfer operator status of the wells under the regulatory program from Diversified to EQT, nor would it be forced to immediately issue plugging permits for the thousands of abandoned wells on Plaintiffs' properties. Rather, Plaintiffs—in concert with a court-appointed receiver—would submit plugging applications for their abandoned wells to WVDEP, which the agency would process according to its normal procedures subject to applicable statutory and regulatory requirements, without any involvement by the court.

Because Plaintiffs' tort and fraudulent transfer claims do not interfere with WVDEP's authority under West Virginia's oil and gas laws, and thus in no way implicate the agency's sovereignty, the district court properly concluded that WVDEP was neither a necessary nor indispensable party under Federal Rule of Civil Procedure 19 ("Rule 19"). Fed. R. Civ. P. 19.

4

## JURISDICTIONAL STATEMENT

This Court lacks jurisdiction over Defendants' interlocutory appeal, which does not involve a reviewable collateral order under *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949). As Plaintiffs explained in their pending Motion to Dismiss for Lack of Jurisdiction (Dkt. 30), this Court—in accord with every other court of appeals to address the question—has unambiguously held that a district court's denial of a motion seeking dismissal under Rule 19 is not a final order and is not subject to interlocutory review absent extraordinary circumstances not present here. *See Runkle v. Genesis Worldwide II, Inc.*, 143 F. App'x 515, 517 (4th Cir. 2005); *see also Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1147–48 (10th Cir. 2011); *Price v. J & H Marsh & McLennan, Inc.*, 493 F.3d 55, 63 (2d Cir. 2007).

It is black letter law that federal courts of appeal "do not possess appellate jurisdiction over interlocutory orders—such as the denial of a . . . Rule 12(c) motion for judgment on the pleadings—because such decisions are not final judgments within the meaning of 28 U.S.C. § 1291." *Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013) ("An order denying a Rule 12(c) motion . . . is a prime example of an interlocutory order." (quoting *Coleman by Lee v. Stanziani*, 735 F.2d 118, 120 (3d Cir. 1984))).

5

Defendants' invocation of WVDEP's sovereign immunity does not transform the district court's plainly interlocutory order into a reviewable "collateral order" under the doctrine established in *Cohen*. *See* Defendants' Opening Brief ("Def. Br.") at 5–6. In *Cohen*, the Supreme Court established a "narrow exception" to the final judgment rule that extends to a "small class" of interlocutory orders that do not end the main litigation. *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981). As Plaintiffs explained in their prior submissions, the challenged order fails to satisfy the second and third prongs of the *Cohen* test. Dkt. 30 at 12–14; Dkt. 39 at 5–10.

The Order fails under the second prong, because, as the briefing in this Appeal makes clear, the district court's denial of Defendants' Rule 19 Motion involved considerations that are "deeply enmeshed in the factual and legal issues comprising the plaintiff's cause of action," *i.e.*, whether or not Diversified has a right to occupy Plaintiffs' properties with its abandoned wells. *See Cobra Nat. Res., LLC v. Fed. Mine Safety & Health Rev. Comm'n*, 742 F.3d 82, 89–90 (4th Cir. 2014) (refusing to apply collateral order doctrine because challenged order was deeply intertwined with the underlying merits). The district court's order is thus not "collateral" to the underlying litigation.

The Order likewise fails under the third prong because it is not effectively unreviewable on appeal. Unlike in the cases cited by Defendants, Plaintiffs here

are not seeking to hail into court a party that claims immunity from litigation. Dkt. 30 at 14–16 (discussing *Alto v. Black*, 738 F.3d 1111, 1130 (9th Cir. 2013)); Dkt. 39 at 6 n.1, 8–9. Defendants do not cite a single case finding that an order denying a motion seeking dismissal for failure to join a required party, whether sovereign or not, constitutes a reviewable collateral order. Entertaining Defendants' interlocutory appeal would represent an unwarranted and unprecedented expansion of this Court's jurisdiction.

Like its assertion of jurisdiction, Defendants' request for mandamus is meritless. Defendants are not entitled to that writ's extraordinary relief, which should "not be used as a substitute for the regular appeals process." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380–81 (2004). First, the standard relief of an appeal following final judgment is adequate. *Id.* at 380. Second, the merits of this appeal are far from "clear and indisputable," *id.*, as shown by the district court's well-reasoned opinions. Third, Defendants' request does not comport with the procedural requirements for a mandamus petition. *See* Fed. R. App. P. 21(a) (requiring the filing of a separate petition).

## STATEMENT OF THE CASE

### I.    Diversified's Limited Right to Use Surface Owners' Properties and Common Law Obligation to Plug Non-Producing Wells

It is helpful at the outset to explain the source of Diversified's common-law obligation to plug abandoned wells on Plaintiffs' properties. Diversified does not

7

own the surface properties that its wells occupy—Plaintiffs do. Diversified's right
to occupy Plaintiffs' properties derives solely from the deeds and leases governing
those properties, which provide only a limited easement allowing Diversified to do
what is necessary to extract minerals.

Most Plaintiffs do not own the rights to the minerals underlying their surface
properties, because those rights were "severed" from the surface estate by deed,
often many decades ago. JA256. Under West Virginia law, when ownership of
mineral real property is separated from ownership of the surface estate, the mineral
owner (and its lessee) has the right to reasonable use of the surface for exploration
and production of minerals. *See Andrews v. Antero Res. Corp.,* 828 S.E.2d 858,
865, 870 (W. Va. 2019) (finding an implied covenant of "reasonable and
necessary" use of the surface estate for mineral extraction when the rights are
severed).

However, when the surface ceases to be used for exploration and production
of minerals, the right of occupancy ceases. *See* Syl. Pts. 4 & 5, *EQT Prod. Co. v.
Crowder*, 828 S.E.2d 800 (W. Va. 2019) (holding that "a mineral owner or lessee
does not have the right to use the surface to benefit mining or drilling operations on

8

other lands, in the absence of an express agreement with the surface owner");[4] *see also* JA282.

In accord with these principles, this Court has explained that "West Virginia's regulatory scheme does *not* create a right of the lessor to commit a trespass if the specific use is not granted or implied in a lease," such that "a permit granted by a state agency pursuant to a regulatory scheme *cannot immunize the permit holder from civil tort liability for actions arising out of use of the permit*." *Whiteman v. Chesapeake Appalachia, LLC*, 729 F.3d 381, 393–94 (4th Cir. 2013) (emphasis added). Indeed, under West Virginia law, no statute or regulation has the power to strip real property owners of their land for the sole benefit of another private party. *See Mountain Valley Pipeline, LLC v. McCurdy*, 793 S.E.2d 850, 860 (W. Va. 2016); Syl. Pt. 1, *Hench v. Pritt*, 57 S.E. 808 (W. Va. 1907); W. Va. Const. Art. III, § 9. Consistent with that rule, WVDEP's regulations make clear that the agency's grant of an application to operate a well does not determine any competing property rights claims. W. Va. Code St. R. § 35-6-3.1.c.

---

[4] For Plaintiffs that maintain ownership of their mineral rights, the right of occupancy is governed directly by lease, the standard terms of which generally permit the operator to occupy the property only as long as gas is produced in "paying" or "commercial" quantities.

Thus, WVDEP has no authority, either by permit or by administrative consent agreement, to confer upon Diversified any right to occupy Plaintiffs' surface properties that was not granted by severance deed or mineral lease. And those deeds and leases only authorize Diversified's wells for as long as their presence is necessary to produce minerals. *See Whiteman,* 729 F.3d at 387.

Because no well produces forever, and because a mineral owner's implied easement to use the surface terminates when the well is no longer producing minerals, the drilling of any well on a surface owner's property creates a common law obligation to plug and remove that well in the future. JA293 (finding that the drilling of wells on Plaintiffs' properties "necessarily gives rise to an obligation on the part of the operator or its successor to plug the well").

## II.     Diversified's Statutory and Regulatory Well-Plugging Obligations

In addition to its common law obligations to plug wells on surface owners' properties when those wells are no longer necessary for the production of minerals, Diversified also has statutory plugging obligations under West Virginia's oil and gas laws.

The West Virginia Legislature has declared that "it is in the public interest and it is the public policy of this state, to foster, encourage and promote the proper plugging of all wells *at the time of their abandonment* to protect the environment and mineral resources of this state." W. Va. Code § 22-10-2(b) (emphasis added);

10

*see also id.* § 22-10-2(a)(1) ("Oil and gas have been continuously produced in West Virginia for over one hundred years, during which time operators of wells have been required by the laws of this state to plug wells *upon cessation of use*." (emphasis added)).

West Virginia Code Section 22-6-19 defines when a well shall be presumed abandoned and thus must be promptly plugged in furtherance of the public interest:

> Any well which is completed as a dry hole *or which is not in use for a period of twelve consecutive months shall be presumed to have been abandoned and shall promptly be plugged by the operator in accordance with the provisions of this article*, unless the operator furnishes satisfactory proof to the director that there is a bona fide future use for such well.

W. Va. Code § 22-6-19 (emphasis added); *see also id.* § 22-6-24 ("Upon the abandonment or cessation of the operation of any well drilled for natural gas . . . the well operator, *at the time of such abandonment or cessation*, shall fill and plug the well in the following manner . . . .") (emphasis added)); *id.* § 22-6-23; W. Va. Code St. R. § 35-5-2.2 ("'Abandoned well' shall mean any well which is completed as a dry hole or which has not produced in commercial quantities for a period of twelve consecutive months."); *id.* § 35-5-5.6 ("Any well that is not in active or inactive status shall be deemed abandoned and shall be promptly plugged by the operator."). Under these laws, a well will be presumed abandoned and must be promptly plugged unless the operator provides "satisfactory proof" that the well has a "bona fide future use," *i.e.*, the well can and will support future production.

11

The Legislative Rules implementing the Statute, which are approved by the Legislature, are explicit about what constitutes "satisfactory proof" necessary to support a "bona fide future use" designation. To establish that a well that has not produced for 12 months has a "bona fide future use"—and thus may be designated as "inactive," as opposed to "abandoned"—the operator must satisfy numerous specific requirements. *See* W. Va. Code St. R. § 35-5-1.1. Most importantly, the operator must submit a "viable plan for utilizing the well including an estimated time for commencement of the future use of the well" for each well for which it seeks inactive status. *Id.* § 35-5-3. That plan must be supported by a long list of technical "information and data" showing the well is capable of future production. *Id.* § 35-5-4. The regulations make clear that "an operator must *demonstrate* bona fide future use to avoid having such well deemed abandoned." *Id.* § 35-5-4.1 (emphasis added).

Further, WVDEP must make certain factual findings specific to the well at issue—including, importantly, a finding that the physical integrity of the well is adequate to prevent gas leakage and pollution—before finding a bona fide future use. *Id.* § 35-5-5 ("Procedure for Designation of Bona Fide Future Use"). An operator's mere suggestion of a *possibility* of future use for *some* of its wells is insufficient to avoid a finding of abandonment and thereby override a property owner's right to have abandoned wells on their property plugged. *See Wilson*

12

*Advisory Comm. v. Bd. of Cnty. Comm'rs*, 292 P.3d 855, 866 (Wyo. 2012)

(collecting cases in support of the principle that a "requirement that certain factors

be demonstrated obligates the agency to decide whether they have been and to

make a finding reflecting its decision").

Finally, to plug a well in compliance with its obligations, Diversified must

submit an application to WVDEP. *See* W. Va. Code § 22-6-23. However,

WVDEP's review of an application is not "part of a delicate balancing process

committed to WVDEP's discretion." *See* Def. Br. 44; *see also* Brief of Amicus

Curiae West Virginia Department of Environmental Protection ("WVDEP Br.") at

8–9. Instead, WVDEP reviews such applications according to specific criteria

contained in its regulations, all of which pertain to either the technical methods of

plugging or providing notice of plugging to certain parties. *See* W. Va. Code St. R.

§ 35-4-13.8; W. Va. Code § 22-6-24. The regulations are intended merely to assure

that wells are plugged properly; they do not grant WVDEP authority to negate

landowners' property rights.

The statute's implementing regulations provide that WVDEP (and any other

party) may *only* object to a plugging application on the ground that it does not

satisfy the technical and procedural requirements regarding plugging. *See* W. Va.

Code St. R. § 35-4-13.8 (stating that "[o]bjections to the proposed plugging of a

well, whether by [WVDEP] or by any affected person, shall not be made except for

13

violation or impending violation of the provisions of W. Va. Code §§ 22-6-23, 22-6-24 or any provision of this rule," which rule establishes the technical plugging requirements).

### III.   The Consent Order Between Diversified and WVDEP

The Consent Order between Diversified and WVDEP was entered at the behest of the company in an effort to limit its liabilities. The Order states that in 2018, following Diversified's acquisition of "approximately 17,000 oil and gas wells located in West Virginia," "*Diversified contacted OOG* regarding a number of . . . those recently acquired wells which are shut in and which have been nonproducing wells for period of time, and some for a period of time sufficient to potentially meet the definition of an abandoned well." JA302 (emphasis added).[5]

The Order establishes a schedule that is "acceptable" to Diversified, under which as few as 50 wells per year will be either plugged or returned to production. JA303–305. However, the Consent Order does not set a limit on the number of wells that Diversified may plug in any year to satisfy its common law property obligations. The district court found that, under the Consent Order's schedule, it could take as long as 480 years to plug just Diversified's currently abandoned

_____

[5] OOG refers to WVDEP's Office of Oil and Gas.

wells, let alone the thousands of remaining marginal wells owned by Diversified whose productive lives will soon expire. JA282.

Contrary to Diversified's characterization of the Consent Order as a blanket "get-out-of-jail-free" card for any plugging liability related to its wells, *see, e.g.*, Def. Br. 34–35, the Order on its face only protects Diversified from enforcement action *by WVDEP*. *See* JA304 (stating that that the abandoned wells identified by Diversified "shall not be subject to any further enforcement activities *by the OOG* with regard to any requirement to close and plug such wells based upon the lack of production in the most previous twelve months so long as Diversified is compliant with the terms and conditions of this Order") (emphasis added).

The Consent Order does not state that Diversified has demonstrated a bona fide future use for any of its wells. Nor does it make any of the findings required by WVDEP's regulations to establish that Diversified's wells have a bona fide future use. *See* JA282 ("[B]y its own terms, the Consent Order admits that the operators have not furnished satisfactory proof to the director that there is a bona fide future use for such well."). Instead, the Consent Order merely states that Diversified *may* at some point demonstrate that *some* of its wells have a bona fide future use. *See* JA302–303. Indeed, even after entry of the Consent Order, WVDEP continues to classify all of Diversified's wells that have not reported production for 12 months as "abandoned," not "inactive." JA200. On its face, then,

15

the Consent Order does not purport to determine any of Plaintiffs' property rights, nor can it be construed as barring common law claims related to those rights.

## IV.    Plaintiffs' Claims and Relief Sought

### 1. *Tort Claims*

Because WVDEP has declined to exercise *its* regulatory authority to require the prompt plugging of the abandoned wells that interfere with Plaintiffs' use of their properties, Plaintiffs have asserted their rights under the common law, which remedies are repeatedly and expressly preserved by West Virginia's oil and gas program. *See* note 3, *supra*. Specifically, Plaintiffs bring trespass and negligence claims seeking money damages in an amount sufficient to cover the costs of plugging and remediating the currently abandoned wells on their properties. JA431–432.

The West Virginia Legislature made clear that the oil and gas regulatory program, and WVDEP's broad authority thereunder, *does not* preclude surface owners' common law tort claims:

> Nothing in section three or elsewhere in this article shall be construed to diminish in any way the common law remedies, including damages, of a surface owner or any other person against the oil and gas developer for the unreasonable, negligent or otherwise wrongful exercise of the contractual right, whether express or implied, to use the surface of the land for the benefit of the developer's mineral interest.

W. Va. Code § 22-7-4(a); *see id.* § 22-7-8 ("The remedies provided by this article shall not preclude any person from seeking other remedies allowed by law."); *id.*

16

§ 22-10-11(a) (describing statutory remedies as "additional and cumulative" and explaining that "nothing herein contained shall abridge or alter rights of action or remedies now or hereafter existing . . . ."); *id.* § 22-7-1(a)(2). Both West Virginia and federal courts have consistently recognized that fact.[6]

Critically, Plaintiffs are *not* asserting a private right of action to enforce West Virginia's statutory and regulatory plugging requirements, *see* Def. Br. 24, which Plaintiffs agree is WVDEP's province. Rather, those statutory requirements merely elucidate the scope of Diversified's common law obligations. This Court has recognized, in the same context of a trespass claim brought by a surface owner against a mineral lessee, that such regulatory requirements, while not controlling,

---

[6] *See CSX Transp. Inc. v. PKV Ltd. P'ship*, 906 F. Supp. 339, 344 n.3 (S.D.W. Va. 1995) ("The fact that CSX may not pursue a cause of action based on the [oil and gas] regulations at issue does not preclude it from maintaining its common law causes of action . . . ." (citing W. Va. Code § 22-7-8)); *Atkinson v. Va. Oil & Gas Co.*, 79 S.E. 647, 647–49 (W. Va. 1913) (holding that activities regulated by the State's oil and gas laws can give rise to common-law liability despite being subject to cumulative enforcement by the state); *Whiteman*, 729 F.3d at 384 ("West Virginia's regulatory scheme does not create a right of the lessor to commit a trespass if the specific use is not granted or implied in a lease."); *EQT Prod. Co. v. Wender*, 870 F.3d 322, 335 (4th Cir. 2017) (explaining that a locality retains its common law remedies regarding oil and gas activities despite the state regulatory program precluding a local ban on activities authorized by the program); *Magers v. Chesapeake Appalachia,* No. 5:12-CV-49, 2013 WL 4099925, at *6 (N.D. W. Va. Aug. 13, 2013) (declining to find an implied private statutory cause of action to enforce West Virginia's oil and gas program because "there are already ways to recover under the common law").

provide evidence of what is "reasonable and necessary" for the production of

minerals, and thus what activity is authorized by a lessee's implied easement.

*Whiteman*, 729 F.3d at 384.

As to negligence, the statutory requirement to promptly plug wells that have

not produced for 12 months provides the standard of care, the breach of which

constitutes a negligent act under West Virginia law. Syl. Pt. 1, *Reed v. Phillips*,

452 S.E.2d 708 (W. Va. 1994) ("A violation of a statute is prima facie evidence of

negligence.").

Furthermore, contrary to Defendants' and WVDEP's assertions, Plaintiffs do

*not* request that Diversified be ordered to immediately plug all of its abandoned

wells. *See* Def. Br. 42; WVDEP Br. 6. Plaintiffs ask only that the Court award

money damages for their tort claims in an amount sufficient to satisfy Diversified's

plugging obligations, which money would be placed in a fund to be administered

by a receiver. JA474–475. If this relief is granted, landowners with abandoned

wells on their property would be permitted to apply to the receiver to have their

wells plugged. The receiver would authorize funds to be expended for such

plugging and an application would be made to WVDEP to assure that the plugging

is accomplished safely and in compliance with the regulations.

Thus, Plaintiffs do not seek to compel WVDEP to take any action

whatsoever. Instead, if Plaintiffs prevail here, they will still have to submit

18

plugging applications to the agency pursuant to the regulatory requirements described above.

## 2. *Fraudulent Transfer Claims*

Because Diversified's billions of dollars of plugging liabilities exceed its assets, rendering Diversified insolvent and unable to satisfy all of its obligations to Plaintiffs, Plaintiffs also allege statutory claims related to the transfer of wells from EQT to Diversified under the Alabama Fraudulent Transfers Act ("AFTA"), Ala. Code § 8-9A-1 et seq., and its successor, the Alabama Voidable Transactions Act ("AVTA"), Ala. Code § 8-9B-1 et seq.[7] Those statutes expressly authorize creditors—including those such as Plaintiffs who maintain a contingent claim for the eventual plugging, removal, and remediation of Diversified's wells—to void transfers that would otherwise make it impossible for their debtors to satisfy their claims. Ala. Code § 8-9A-7(a); *id*. § 8-9B-8(a)(1); JA292–293.[8] Further, Alabama

---

[7] The Alabama statutes are applicable because Diversified is headquartered in Alabama. The AFTA, Ala. Code § 8-9A-1 et seq., applies to transfers that took place prior to January 1, 2019—in this case, the July 2018 transfer. The AVTA, Ala. Code § 8-9B-1 et seq., applies to transactions that took place on or after January 1, 2019—in this case, the May 2020 transfer.

[8] An "actual" fraudulent transfer occurs when the debtor makes such a transfer with the intent to hinder or delay its creditors. Ala. Code § 8-9A-4; *id.* § 8-9B-5. A "constructive" fraudulent transfer occurs, regardless of intent, when a creditor fails to receive reasonably equivalent value for assets transferred or obligations incurred, and it is "insolvent" at the time of the transfer. *Id.* §§ 8-9A-4, -5; 8-9B-5, -6.

Code Sections 8-9A-7(a)(3)(b) and 8-9B-8(a)(3)(ii) explicitly allow for the court, subject to equitable principles, to "appoint[] a receiver to take charge of" the funds resulting from a fraudulent transfer claim, as Plaintiffs have requested here.

Here, Diversified's transfer of roughly $700 million to EQT in the 2018 and 2020 transactions—and its associated incurrence of the more than one billion dollars in plugging obligations attached to the 12,000 wells it received from EQT—rendered Diversified insolvent. JA414–416. Diversified did not receive "reasonably equivalent value" for the money it transferred to EQT, and both parties knew that the transfers would render Diversified incapable of satisfying its plugging liabilities. The sales thus constitute both actual and constructive fraudulent transfers and may be avoided. JA470–473.

Contrary to Diversified's contention, Def. Br. 3, Plaintiffs do not seek to "rescind the transfer of thousands of wells." Rather, Plaintiffs' fraudulent transfer claims seek only to have *the assets* (*i.e.*, the nearly $700 million dollars) preserved to satisfy their claims, and to have *the liabilities* associated with the more 12,000 transferred wells (*i.e.*, the monetary obligations for plugging those wells) re-imposed upon EQT to the extent they cannot be satisfied by Diversified. *See* JA474; *see also* JA416. The avoidance of the transfers Plaintiffs seek would involve only the preservation of money assets and the monetary asset retirement liabilities associated with the oil and gas wells, *not the wells themselves*. This

20

accounting exercise between Diversified and EQT does not require a change in operator status under West Virginia's regulatory program. *See* W. Va. Code St. R. §§ 35-6-3, 35-4-10.

## V.     Proceedings Below

Defendants' Rule 19 motion at issue in this appeal is one of three separate motions filed by Defendants seeking dismissal of Plaintiffs' claims on the ground that they allegedly infringe on WVDEP's regulatory authority. The district court properly rejected all three.

In support of their first Motion to Dismiss, Defendants argued that Plaintiffs' tort claims must be dismissed because they impermissibly interfere with WVDEP's "exclusive" regulatory authority under West Virginia's oil and gas laws. More specifically, they argued that Plaintiffs' claims constitute an impermissible collateral attack on the Consent Order over which the Court lacks jurisdiction. JA162–167. Defendants also argued that the Court lacked jurisdiction because Plaintiffs did not file an ultimately unreviewable complaint with WVDEP under West Virginia Code Section 22-6-28(a), essentially claiming that Plaintiffs failed to exhaust their administrative remedies. JA168–169.

The district court denied Defendants' Motion, citing the oil and gas program's multiple savings clauses and explaining that the "West Virginia Legislature made clear that the remedies provided by the regulatory program are

not exclusive and *do not preclude surface owners' common law claims*." JA282–283 (emphasis added). As to the Consent Order, the court found that the "agreement entered into between the [WVDEP] and the well operators, without prior notice to the surface owners or lessees, without subsequent notice to the surface owners or lessees, with no right of appeal" was "simply an exercise of [WVDEP]'s prosecutorial discretion and has no effect on the plaintiffs' property rights." JA282 (citing *Citizens for a Better Env't-Cal. v. Union Oil Co. of Cal.*, 861 F. Supp. 889, 902–03 (N.D. Cal. 1994), *aff'd*, 83 F.3d 1111, 1120 (9th Cir. 1996) (explaining that administrative orders extending compliance deadlines reflect an agency's prosecutorial discretion and do not bar actions separately authorized for private citizens)).

The court also concluded that Plaintiffs were not required to file an unreviewable complaint with WVDEP before bringing their tort claims. The court explained that the oil and gas program makes clear that its remedies are not exclusive and that the complaint process is neither designed nor adequate to afford Plaintiffs the common law relief they seek. JA284–285 (citing Syl. Pt. 2, *Wiggins v. Eastern Associated Coal Corp.*, 357 S.E.2d 745, 748 (W. Va. 1987) (recognizing that exhaustion is not required where the administrative remedy is inadequate)).

Finally, the Court found that the "requirement for the [WVDEP] to issue a permit for well plugging is not an obstacle to plaintiffs' requested relief." JA285.

After denial of their Rule 12(b)(6) Motion, Defendants filed a Rule 12(c) Motion for Judgment on the Pleadings. By that Motion, Defendants argued that, because WVDEP is an indispensable party under Rule 19 that cannot be joined due to its sovereign immunity, Plaintiffs' claims must be dismissed. JA297. In support of their second Motion, Defendants repeated their already rejected arguments that Plaintiffs' suit interferes with WVDEP's exclusive regulatory interests—including its interests in the Consent Order—and that WVDEP's exclusive authority to permit the plugging of a well would create obligations inconsistent with Plaintiffs' requested relief. JA323–329.

The district court denied that Motion as well, finding that WVDEP is neither a necessary nor indispensable party. JA393. The court expressly acknowledged WVDEP's sovereign regulatory authority, but concluded that Plaintiffs' claims for money damages do not implicate or infringe on that authority:

> Plaintiffs are not requesting this Court to order [WVDEP] to take any action or instruct the state agency and state officials on how to conform their conduct to state law. This Court has previously held that it need not reject [WVDEP] and Diversified's Consent Order to vindicate plaintiffs' property rights. . . .

> If this Court grants the relief sought by plaintiffs, plaintiffs would be entitled to money damages to cover the costs of well plugging and remediation. This Court would not enter an Order to the effect of instructing [WVDEP] that they must plug and remediate the wells at issue. . . .

> [P]lugging plaintiffs' abandoned and nonproducing wells

23

would not be inconsistent with the Consent Order. If plaintiffs are granted their requested relief, defendants['] obligations to [WVDEP] under the Consent Order would be satisfied.

JA408–410. The court also concluded that "it is mere speculation that [WVDEP] would deny the permits necessary to plug and remediate abandoned, nonproducing wells on plaintiffs' properties." JA410.

Accordingly, far from saying "essentially nothing" about the impact of Plaintiffs' claims on WVDEP's sovereign regulatory interests, *see* Def. Br. 18, 25, the court after careful consideration determined that Plaintiffs' exercise of their common law rights would not interfere with WVDEP's exercise of its parallel statutory authority.

Finally, the court found that the impact of denying an adequate remedy to thousands of West Virginia landowners with abandoned wells on their properties would outweigh any possible prejudice to Defendants. JA410.

After the district court denied Defendants' Motion for Judgment on the Pleadings—in the order that Defendants now attempt to appeal—Plaintiffs filed the operative Third Amended Complaint. The Third Amended Complaint omits Plaintiffs' previously pled nuisance claims; requests that damages awarded be placed into a fund "to be used to plug and otherwise decommission Class members' wells in West Virginia"; and asks the court to appoint a receiver to oversee that fund. JA474–475.

Shortly thereafter, Defendants noticed this appeal, seeking to challenge the court's order denying their Motion for Judgment on the Pleadings based on the Second Amended Complaint. JA477. After noticing their appeal, Defendants moved to dismiss the Third Amended Complaint, once again arguing that Plaintiffs' claims should be dismissed because they interfere with WVDEP's regulatory authority—this time under the abstention doctrine announced in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). JA480.

In response, the district court *again* denied Defendants' Motion, explaining that, "as this Court has already held multiple times, (1) Plaintiffs lack an adequate alternate remedy to their common law tort and fraudulent transfer claims, and (2) Plaintiffs' claims are expressly preserved by West Virginia's oil and gas program and thus do not interfere with that law nor with [WVDEP]'s exercise of prosecutorial discretion embodied in the Consent Order." JA529–530. The court thus determined that Plaintiffs' claims are not "disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Id.* (quoting *New Orleans Pub. Serv. Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989)).

In this appeal, Diversified again advances its thrice-rejected proposition that allowing this lawsuit to proceed would impermissibly interfere with WVDEP's "exclusive" regulatory authority under West Virginia's oil and gas laws. As

25

Plaintiffs have explained, this appeal should be dismissed outright on jurisdictional grounds. But if this Court considers the appeal on the merits, it should be rejected for the reasons stated below.

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion in denying Defendants' Rule 19 Motion because WVDEP is neither a necessary nor indispensable party to this lawsuit.

First, WVDEP is not a necessary party under Rule 19(a)(1)(A) because WVDEP's presence is plainly not required to afford complete relief between Plaintiffs and Defendants. The only remedies that Plaintiffs seek are monetary damages from Defendants. They do not demand the immediate plugging of all Diversified wells, nor do they ask the court to order WVDEP to take any action.

Contrary to Defendants' repeated assertions, because Plaintiffs' requested relief under the fraudulent transfer statutes involves only money, it does not require WVDEP to undo the agency's previous transfer of operator status from EQT to Diversified. Moreover, although the plugging of abandoned wells requires WVDEP's approval, the agency's regulations only authorize WVDEP to object to a plugging application on the basis that the plugging methods do not comply with the technical statutory and regulatory requirements. Regardless of any relief Plaintiffs are awarded, no well would be plugged without the approval and

26

oversight of WVDEP to assure that the wells are safely and effectively plugged, in accordance with the agency's regulations. The district court thus correctly determined that the plugging permit requirement posed no obstacle to Plaintiffs' relief.

The district court likewise acted within its discretion in concluding under Rule 19(a)(1)(B)(i) that Plaintiffs' claims will not impair or impede any regulatory interest of WVDEP, including any interest in the Consent Order with Diversified. Diversified's right to occupy Plaintiffs' properties depends entirely on the mineral severance deeds and leases that grant an implied easement to use the surface for as long as mineral production is ongoing—and no longer. West Virginia's oil and gas laws, as interpreted by both this Court and West Virginia's highest court, unequivocally preserve surface owners' ability to enforce their common law property rights against operators, regardless of WVDEP's authority. WVDEP thus has no legally protected interest that will be impaired by awarding Plaintiffs the relief requested here.

Contrary to WVDEP's contention, the Consent Order does not establish such an interest. That Order embodies WVDEP's decision not to employ *its own* enforcement authority after finding that Diversified was in violation of West Virginia's statutory requirement to plug its abandoned wells, a decision that Plaintiffs in no way seek to disturb. The Order does not change the legal status of

27

the wells on Plaintiffs' properties and does not—and, indeed, could not—usurp Plaintiffs' common law property rights. Neither the Consent Order, nor any other provision of West Virginia law, provides WVDEP with a legally protected interest in preventing Plaintiffs from obtaining the relief sought here—monetary damages that would be used to plug Plaintiffs' wells only after receiving approval from WVDEP in accord with its regulations.

Further, the district court correctly concluded under Rule 19(a)(1)(B)(ii) that granting Plaintiffs' requested relief would not subject Defendants to inconsistent obligations. An award of monetary damages to Plaintiffs would not require Diversified to violate the Consent Order or any other lawful order that WVDEP could issue. The Consent Order establishes the floor, not the ceiling, on the number of abandoned wells that Diversified must plug, and does not purport to limit which wells Diversified may plug. Moreover, such an order would in fact *ensure* compliance with the operative terms of the Consent Order. WVDEP thus satisfies none of the requirements to qualify as a necessary party under Rule 19(a).

Finally, the district court did not abuse its broad discretion in refusing to dismiss Plaintiffs' claims under Rule 19(b). Even if WVDEP were a necessary party, it would not be "indispensable" under the rule's equitable balancing test merely because it is a sovereign. The sovereign interests at issue in the cases that Defendants rely on are far more concrete and substantial than WVDEP's claimed

28

interest in delaying the plugging of the abandoned wells on Plaintiffs' properties, which has no basis in any law. The district court was thus well within its discretion to find that the harm caused by depriving thousands of West Virginia landowners of an adequate remedy to enforce their property rights would outweigh any impact on other parties resulting from granting Plaintiffs' requested relief—such that, "in equity and good conscience," dismissal was not required.

## STANDARD OF REVIEW

As Defendants acknowledge, the Court reviews district court decisions under Rule 19 for abuse of discretion. Def. Br. 25. That discretion is at its height when the district court weighs whether "in equity and good conscience," a plaintiff's claims should be dismissed under Rule 19(b). *United States v. Sweeny*, 418 F. Supp. 2d 492, 500 (S.D.N.Y. 2006); *Hood v. City of Memphis*, 570 F.3d 625, 628 (5th Cir. 2009) ("Determining whether a suit should be dismissed in the absence of a required party is a highly-practical, fact-based endeavor, and a district court will ordinarily be in a better position to make a Rule 19 decision than a circuit court would be." (cleaned up)). This Court may affirm the district court on "any ground supported by the record even if it is not the basis relied upon by the district court." *Ostrzenski v. Seigel,* 177 F.3d 245, 253 (4th Cir. 1999).

29

## ARGUMENT

**I.    Governing Legal Standards Under Rule 19.**

Dismissal under Rule 19 is "a drastic remedy that should be employed only sparingly." *Teamsters Loc. Union No. 171 v. Keal Driveaway Co*., 173 F.3d 915, 918 (4th Cir. 1999); *see also Owens-Illinois, Inc. v. Meade*, 186 F.3d 435, 441 (4th Cir. 1999) ("Courts are loath to dismiss cases based on nonjoinder of a party . . . ."); *Francis Oil & Gas, Inc. v. Exxon Corp*., 661 F.2d 873, 879 (10th Cir. 1981) ("The philosphy [sic] of the rule is to avoid dismissal whenever possible."). Dismissal should be ordered only when significant "prejudice or inefficiency will *certainly* result" from the absence of an interested party. *Owens-Illinois*, 186 F.3d at 441 (emphasis added). The burden lies with the party urging dismissal to prove such a certainty. *Id.*

Consideration of whether an absent party is necessary and indispensable under Rule 19 is a two-step process. First, under Rule 19(a), the Court must determine if the absent person is a necessary party either because "in that person's absence, the court cannot accord complete relief among existing parties," Fed. R. Civ. P. 19(a)(1)(A), or "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may" either (1) "as a practical matter impair or impede the person's ability to protect the interest" or (2) "leave an existing party subject to a substantial risk of incurring

double, multiple, or otherwise inconsistent obligations because of the interest,"
Fed. R. Civ. P. 19(a)(1)(B).

If a necessary party cannot be joined, the Court must determine whether the
party is "indispensable" under Rule 19(b), such that the case cannot "in equity and
good conscience" proceed in its absence. Fed. R. Civ. P. 19(b). "Such a decision
'must be made pragmatically, in the context of the substance of each case, rather
than by procedural formula' . . . ." *Owens-Illinois*, 186 F.3d at 441 (quoting
*Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 119 n.16
(1968)). "The language of Rule 19(b) leaves the district court with substantial
discretion in considering which factors to weigh and how heavily to emphasize
certain considerations in deciding whether the action should go forward.'" *Sweeny*,
418 F. Supp. 2d at 500 (cleaned up); *see also Schutten v. Shell Oil Co.*, 421 F.2d
869, 871 (5th Cir. 1970).

## II. The District Court Did Not Abuse Its Discretion When Finding That WVDEP Is Not a Necessary Party Under Rule 19(a).

In this case, the district court did not abuse its discretion in denying
Defendants' Rule 19 Motion because WVDEP does not qualify as a necessary
party under any of Rule 19(a)'s three prongs.[9]

---

[9] WVDEP has submitted an amicus brief to this Court supporting reversal of
the rulings below. Because that brief contains the same arguments made by
Defendants, Plaintiffs do not address it in detail here, except to note that WVDEP's

1. *The District Court Can Award Complete Relief to Plaintiffs in the Absence of WVDEP.*

First, there is no doubt that the court can provide complete relief to Plaintiffs without WVDEP being named a party to this lawsuit. Defendants' argument to the contrary is predicated on the fact that only WVDEP may authorize the plugging of a well. Def. Br. 28–30. Although that fact is true, it is irrelevant. As the district court recognized, the *only* relief that Plaintiffs request from the court is monetary damages. *See* JA408–410. WVDEP's participation is plainly not required for the court to order payment from Defendants sufficient to cover the costs of well plugging and remediation. *See Francis Oil & Gas*, 661 F.2d at 879; *Key Constructors, Inc. v. Harnett Cnty.*, 315 F.R.D. 179, 184 (E.D.N.C. 2016).

---

position that "the State entirely occupies the field of oil and gas well reclamation" is disproved by the fact that—as explained above—the Legislature expressly preserved individuals' rights to bring common law claims. *See*, *e.g.*, *Sprietsma v. Mercury Marine*, 537 U.S. 51, 69 (2002) (finding that Congress's inclusion of common law savings clause evidenced its intent *not* to occupy the field of regulation to the exclusion of state law claims). Notably, WVDEP does not mention the oil and gas laws' savings clauses in its brief. Moreover, WVDEP's assertion that the district court's refusal to dismiss Plaintiffs' claims would undermine the agency's authority to determine whether wells have been abandoned (and thus should be plugged) ignores that Plaintiffs merely seek money damages to pay for the costs of plugging wells that are abandoned as defined by unambiguous statutory and regulatory provisions. WVDEP's omissions and misrepresentations of those laws render its amicus brief unworthy of any deference that might otherwise be due. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) ("If uncertainty does not exist, there is no plausible reason for deference" to agency's interpretation of its regulations).

Additionally, as the district court also recognized, neither the Consent Order nor any other regulatory requirement prevents WVDEP from granting the permits to plug and remediate the wells. *See* JA285; JA410. Rather, WVDEP's regulations only authorize it to object to a well-plugging application on the grounds that the plugging methods would violate West Virginia's technical and procedural requirements. W. Va. Code St. R. § 35-4-13.8.[10]

That fact gives the lie to Defendants' claim that "WVDEP, as a non-party to this litigation, could (and almost certainly would, given its representations) refuse" to grant applications to plug abandoned wells on Plaintiffs' properties. *See* Def. Br. 28. But even if it were true that WVDEP "almost certainly would" refuse to grant applications to plug wells on Plaintiffs' property (and, to be clear, that statement is false), that would not render the district court unable to grant Plaintiffs the relief they seek here—money damages.

Indeed, courts routinely order relief that requires a defendant to obtain a separate permit or authorization without joining the permitting authority. *See*, *e.g.*, *Balt. Neighborhoods, Inc. v. LOB, Inc.*, 92 F. Supp. 2d 456, 473 (D. Md. 2000) (appointing special master to oversee defendant's retrofitting of a building to

---

[10] Such *pro forma* plugging approvals may even be given verbally, without issuance of a well-work permit. W. Va. Code St. R. § 35-4-13.7.

comply with Americans with Disabilities Act, including "obtaining necessary permits"); *Weinberger v. Romero-Barcelo*, 102 S. Ct. 1798, 1804 (1982) (ordering the Navy to apply for a permit under the Clean Water Act without joining the permitting agency).

Under Defendants' logic, nearly any claim involving an activity subject to regulation, such as seeking the retrofitting of a building to accommodate disabled persons, would require joinder of the regulatory agency, for example the local zoning board or building inspector. Rule 19 plainly does not command such an unworkable result. The district court thus properly concluded that the "requirement for the [WVDEP] to issue a permit for well plugging is not an obstacle to plaintiffs' requested relief," JA285, and that WVDEP's "participation in the above-styled case is plainly not required for this Court to order payment from defendants sufficient to cover the costs of well plugging and remediation," JA408.

Nor is WVDEP's presence needed for the court to provide relief under the fraudulent transfer statutes. Importantly—and despite Defendants' repeated contentions to the contrary, *see, e.g.*, Def. Br. 3, 22, 24, 29, 38—Plaintiffs are *not* seeking to transfer ownership of the wells themselves. Rather, as with their tort claims, Plaintiffs' fraudulent-transfer claims seek only monetary relief, whereby EQT would return to Diversified the nearly $700 million dollars it received from Diversified, which would then be available to plug Diversified's abandoned wells.

34

That is the standard relief afforded by the fraudulent transfer statutes. *See* Ala. Code §§ 8-9A-7, 8-9B-8. "In Alabama, a court's setting aside of a fraudulent transfer *does not revest title in the debtor*. Instead, the transferee continues to own the fraudulently transferred assets; the transfer is void only as to the creditor, and the creditor can execute on those assets directly." *Ex parte HealthSouth Corp.*, 974 So. 2d 288, 297 (Ala. 2007) (emphasis added).

Because ownership of the wells would not change hands, and EQT would not be required to operate the wells, WVDEP's previous transfer of operator status from EQT to Diversified need not be "rescinded." *See* W. Va. Code St. R. §§ 35-6-3, 35-4-10. Defendants' protestation to the contrary is a red herring. In truth, WVDEP would not be required to take *any* action to effectuate the relief Plaintiffs seek, and thus WVDEP's fears that Plaintiffs' claims would overwhelm the agency's limited resources are unfounded. *See* WVDEP Br. 8.[11]

This case is not even remotely like *Tillman v. City of Milwaukee*, upon which Defendants rely. *See* Def. Br. 29-30. There, the absent state agency was directly responsible for the challenged termination of employment and would have had to take direct action to grant the plaintiff's requested relief of reinstatement.

---

[11] The West Virginia oil and gas laws do not establish a specific timeframe in which WVDEP must process well plugging applications and Plaintiffs' complaint does not seek to impose any timeframe.

715 F.2d 354, 356–57 (7th Cir. 1983). Because Plaintiffs do not ask the court to order WVDEP to take any action, the district court properly found under Rule 19(a)(1)(A) that it could award the complete relief Plaintiffs' seek—money damages—without joining WVDEP. JA408–409.

> 2. *Awarding Plaintiffs the Requested Relief Would Not Impair or Impede WVDEP's Interests.*

Nor will allowing this lawsuit to proceed "impair or impede" WVDEP's interests within the meaning of Rule 19(a)(1)(B) because WVDEP has no interest in preventing the plugging of the wells on Plaintiffs' properties. When evaluating this prong of Rule 19, "[i]t is important to identify clearly the [absent party's] interest at stake." *Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California*, 547 F.3d 962, 971 (9th Cir. 2008) ("*Cachil*").

Not just any interest will suffice. Rather, a "crucial premise" of mandatory joinder under Rule 19 is that "the absent [party] possess an interest in the pending litigation that is '*legally protected.*'" *Id.* (emphasis added); *see also Cnty. of Brunswick v. Lexon Ins. Co.*, No. 7:09-CV-60-BO, 2010 WL 11565094, at *3 (E.D.N.C. Feb. 8, 2010) (same); 3A *Moore's Federal Practice* ¶ 19.07[2.-0], at 19–99 (2d ed. 1986) (explaining that Rule 19 requires more than merely financial interest or interest of convenience). That a party's claims could result in an outcome contrary to the "preference" of an absent party—including an absent

36

sovereign—does not give rise to a legally protected interest. *Cachil*, 547 F.3d at 971.

Further, the mere fact that a dispute between two parties arises in the context of a heavily regulated industry does not make the regulator a necessary to party to every such dispute. *See Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1046 (9th Cir. 1983) ("The Government is not a necessary party to what is essentially a contract and antitrust action between private parties solely because the dispute arises in the regulated military aircraft industry.").

This lawsuit will not impair or impede any of WVDEP's protected interests, for several reasons.

**1**. First, West Virginia law does not confer upon WVDEP any legally protected interest in preventing the plugging of wells, so long as the technical and procedural well plugging requirements in WVDEP's regulations are satisfied. WVDEP's legally protected interests must arise from some affirmative grant of power by the Legislature. Under West Virginia law, "[a]dministrative agencies and their executive officers are creatures of statute . . . so that they must find within the statute warrant for the exercise of any authority which they claim." *W. Va. Off. of Miners' Health, Safety & Training v. Beavers*, 874 S.E.2d 726, 733 (W. Va. 2022) (quoting Syl. Pt. 1, *Francis O. Day Co.*, *Inc. v. W. Va. Reclamation Bd. of Rev.*, 424 S.E.2d 763 (W. Va. 1992)).

37

West Virginia law provides that wells that have not produced for 12 months are presumed abandoned and *must* be promptly plugged. W. Va. Code § 22-6-19; *see also id.* § 22-10-2(b) (stating the public policy of the state to require plugging of wells at the time of their abandonment). That statute's implementing regulation establishes a process by which an operator may avoid that presumption by supplying "proof" to WVDEP that a well has a "bona fide future use." *Id.* § 22-6-19. The legislatively-approved rules interpreting that statute require operators to provide a detailed factual demonstration, on a well-by-well basis, that each well is capable of such use, *and* require WVDEP to make specific determinations regarding each well before finding a bona fide future use.[12] W. Va. Code St. R. § 35-5-1 *et. seq.*

The rules allow WVDEP to approve a "schedule" giving operators "extended time" under the regulatory program to plug abandoned wells, *id.* § 35-6-7, but that does not change those wells' status as "abandoned" under state law. Because that regulation cannot contravene the plain statutory language of West

---

[12] The statute's language requiring that the proof of bona fide future use be "satisfactory . . . to the director" of WVDEP's Office of Oil and Gas does not grant the agency unbounded discretion to find a bona fide future use where the operator has not made the necessary factual demonstration. *See United States v. Jefferson Elec. Mfg. Co.*, 291 U.S. 386, 397–99 (1934) (explaining that such language does not "absolute authority or discretion" on the deciding officer but rather "means that the additional element is not lightly to be inferred but to be established by proof which convinces in the sense of inducing belief").

Virginia Code Section 22-6-19, it cannot not dispense with that statute's evidentiary requirement.

Therefore, the *only* way to avoid the law's presumption of abandonment is through the specific demonstration of a bona fide future use required by statute, *which Diversified has unquestionably not made regarding any of its wells*. Regardless, neither the Consent Order, JA301–303, nor WVDEP's amicus brief identify Section 35-6-7 as the source of authority for the Order, and Defendants did not cite that regulation in their briefing to the district court. JA313, JA375.

West Virginia law requires the prompt plugging of abandoned wells, but no provision of State law *prevents* the plugging of wells that are not abandoned if an operator chooses to do so. Nothing in the law says that a party *may not* apply to plug a well that has the capacity for bona fide future use, such that WVDEP has no authority to prevent them from doing so. WVDEP has no authority to prevent an operator from plugging its wells, so long as the plugging will be accomplished in compliance with the technical safety and notice regulations.

Further, WVDEP's decision not to exercise *its enforcement authority* to require the plugging of an abandoned well cannot deprive landowners of their right against unlawful trespass on their properties. Instead, a landowner's ability to remedy unplugged and abandoned wells on their property is governed by deeds, leases, and trespass law (all of which the West Virginia Legislature placed beyond

39

the scope of WVDEP's authority). West Virginia's oil and gas laws expressly and repeatedly preserve "the common law remedies, including damages, of a surface owner . . . against the oil and gas developer for the unreasonable, negligent or otherwise wrongful exercise of the contractual right, whether express or implied, to use the surface of the land." W. Va. Code § 22-7-4(a); *see also id.* §§ 22-7-8, 22-10-11(a), 22-7-1(a)(2); *CSX Transp. Inc.*, 906 F. Supp. at 344 n.3; *Atkinson*, 79 S.E. at 647–49; *Whiteman*, 729 F.3d at 384; *EQT Prod. Co.*, 870 F.3d at 335; *Magers*, 2013 WL 4099925, at *6.[13]

Thus, even if WVDEP had some reason to abstain from enforcing the statutes under which it operates and to allow Diversified indefinite time to evaluate its wells for future potential production, the Legislature has not granted the agency

---

[13] Those statutes and cases follow the broader principle of West Virginia law that actions to enforce property rights fall within the province of the courts and do not intrude on agencies' implementation of related statutory schemes. *See Hedrick v. Grant Cnty. Pub. Serv. Dist.*, 550 S.E.2d 381, 386–87 (W. Va. 2001) ("We find that such a suit for damages is within the conventional experience of judges, and does not lie peculiarly within the agency's discretion or require the exercise of agency expertise."); *State ex rel. Bell Atl.-W. Va., Inc. v. Ranson*, 497 S.E.2d 755, 762–63 (W. Va. 1997) ("All of plaintiffs' [common law] claims… are clearly within the usual province of circuit courts . . . and require no special regulatory expertise."); *Price v. Boone Cnty. Ambulance Auth.*, 337 S.E.2d 913, 915 (W. Va. 1985) ("It may reasonably be concluded that although the Legislature created the Human Rights Commission as the primary enforcement mechanism for rights created by the Act, it intended to preserve the ability of a complainant to resort to circuit court when either he had an independent right to do so or when the administrative process proved ineffective.").

legal authority to prevent the plugging of wells so long as Plaintiffs can satisfy the technical and procedural well plugging requirements set forth in WVDEP's regulations. *See Cachil*, 547 F.3d at 966–68, 971–72 (refusing to find absent sovereign tribes necessary parties because the tribes lacked any legally protected interest in preventing the plaintiff tribe from obtaining the relief it sought, regardless of the absent tribes' preference that the court not grant that relief).

**2.** Because West Virginia law plainly recognizes landowners' rights to use the common law to protect their property rights despite WVDEP's regulatory authority under the oil and gas program, Plaintiffs' claims do not interfere with WVDEP's exercise of that authority as embodied in the Consent Order. As the district court concluded, the Consent Order is merely an agreement between Diversified and WVDEP whereby WVDEP agrees not to use *its own enforcement authority* to mandate the plugging of Diversified's abandoned wells as required by statute, so long as Diversified complies with the Order's terms. JA282; JA408–409. The language of the Consent Order *does not in any way* prevent Diversified from plugging any well it chooses, regardless of the potential for future production. JA304–405.[14]

_____

[14] For instance, in four years under the Consent Order, Diversified has plugged 148 wells, which, while representing only a small fraction of its abandoned wells, is far more than the minimum 20 wells that the Consent Order requires to be plugged each year. *See* Def. Br. 1–2. And Diversified did not

Accordingly, both Diversified and WVDEP retain the full benefit of their

bargain, and Plaintiffs' claims are not "aimed at" and do not "invalidate" that

agreement, but only enforce their independent property rights. *See Cachil*, 547

F.3d at 972 (emphasizing that the plaintiff tribe sought only to enforce rights under

*its own* contract, not invalidate the absent tribes' contracts); *Citizens for a Better

Env't-Cal.*, 861 F. Supp. at 902 (explaining that a consent agreement's "assurances

regarding authorities' intended exercise of their enforcement discretion carry great

real-world significance" even where private parties may enforce the same

requirements).

Nor would Plaintiffs' common law claims for money damages interfere with

WVDEP's legitimate interests in approving and overseeing the plugging of wells.

If Plaintiffs were to apply to plug a well using money damages awarded by the

court, WVDEP would process that application according to its regulations. As

always, WVDEP could deny any application that does not satisfy the technical

requirements of the statutes and regulations. W. Va. Code St. R. § 35-4-13.8.

Plaintiffs do not seek to dictate or interfere with this process in any way.

**3.** In arguing that Plaintiffs' claims would impair WVDEP's interests,

Defendants rely on a single statement in the Consent Order, providing that

_____

demonstrate that those wells were incapable of future production before plugging
them.

Diversified and WVDEP "agree that it is in the best interests of the state and its citizens that these wells be identified and that where a bona fide future use exists, wells should be placed back into production." Def. Br. 1, 10, 22–23, 31, 48, 52.

Defendants claim that this statement establishes WVDEP's "regulatory interests in not having wells plugged." Def. Br. 22; *id.* at 7 (claiming that the Legislature enacted West Virginia's oil and gas laws to "ensure that [wells] are not plugged until it is certain that they cannot be put to some beneficial use"). As explained above, this gets the law exactly backwards: the statute mandates that wells are presumed abandoned and must be promptly plugged *unless* the operator submits "proof" of a bona fide future use. It provides no authority for WVDEP to prohibit the plugging of a well that meets the agency's regulatory requirements, regardless of potential for future use. It is also contrary to the Legislature's express statements of policy. *See*, *e.g.*, W. Va. Code § 22-10-2(b) (describing state policy "to promote the proper plugging of all wells at the time of their abandonment to protect the environment and mineral resources of this state); *id.* § 22-10-2(a)(1) (recognizing that operators have been required to plug wells "upon cessation of use" for over 100 years); *id.* § 22-6-24 (requiring plugging by specific methods "upon the abandonment or cessation of the operation of any well drilled for natural gas").

43

Defendants' argument is not even supported by the Consent Order itself. The statement Defendants cite appears only in the Order's "Findings of Fact" section. *See* JA302. The "Order for Compliance" section, which sets out the actual requirements imposed upon Diversified, in no way restricts the company's ability to plug any of its wells. The Order does not purport to make economic decisions for Diversified by *requiring* it to establish that there is no bona fide future for wells before it plugs, JA303–307, and rightfully so, because such economic decisions are beyond WVDEP's regulatory purview.

Importantly, neither Defendants nor WVDEP attempt to explain how placing such a limitation on the plugging of wells would be consistent with WVDEP's statutory and regulatory authority. In fact, the effect would be to nullify the bona fide future use requirement, which demands that operators affirmatively demonstrate a well's capacity for future use and provide a timeline for that use. The Consent Order does not provide *any* deadline for Diversified to demonstrate that *any* of its wells have a bona fide future use, nor does it provide for any review by WVDEP of those wells' capability for future production. Rather, it merely allows the company to select 50 of its thousands of abandoned wells each year, at its discretion, to either plug or return to production. JA304–305. If the isolated statement in the Consent Order is given the meaning Defendants urge, no landowner would *ever* be able to demand the plugging of an abandoned well on its

44

property. Operators would be permitted to leave abandoned, derelict, and leaking wells on landowners' properties in perpetuity, leaving them bereft of any remedy.

Despite the novel and unsupported litigation position asserted in its *amicus* brief to this Court, WVDEP lacks the authority to interpret its Consent Order to deprive thousands of surface owners of their common law remedies, because such an act would be plainly *ultra vires* given the absence of any statutory or regulatory grant of power from the Legislature and the oil and gas laws' numerous savings clauses designed to prevent such an outcome. In fact, neither WVDEP nor Diversified provides a single example of WVDEP interference in the decision of an operator to plug a well.

**4**. This case is nothing like the cases that Defendants cite, which all involve direct interference with a sovereign's concrete, legally protected interests.

For example, in *Florida Wildlife Federation v. U.S. Army Corps of Engineers*, the non-party state agency had authority under the governing law to allocate water among competing uses in a water management system according to its discretion. 859 F.3d 1306, 1311–12 (11th Cir. 2017). The injunction the plaintiffs sought against the Army Corps would have directly constricted how the agency could exercise that discretion and thus interfered with its "ability to discharge all its duties" under the law. *Id.* at 1317. Here, WVDEP has no duty—and, indeed, no right—to prevent the plugging of any well based on its potential

for future use, so long as WVDEP's regulatory requirements are satisfied.[15] Therefore, Plaintiffs' claims cannot possibly interfere with such an interest.

The interference with a concrete sovereign interest was similarly direct in *Yashenko v. Harrah's NC Casino Company*. There, the plaintiff brought an employment discrimination case against a company that operated a casino owned by a sovereign tribe, complaining of a policy mandated by the company's contract with the tribe that gave employment preference to tribal members. 446 F.3d 541, 551–52 (4th Cir. 2006). Granting the relief sought would have prevented application of the tribal preference and thus directly interfered with the tribe's "'sovereign capacity to negotiate contracts and, in general, to govern' the reservation." *Id.* at 553. Here, in contrast, Plaintiffs' tort claims are expressly preserved by the oil and gas laws and do not interfere with WVDEP's Consent Order, which does not and cannot usurp Plaintiffs' property rights.

Defendants' reliance on *United States v. Atlantic Wood Industries* is equally misplaced. There, the Commonwealth of Virginia and the United States, on behalf of EPA, brought an action for cleanup costs against the owners of a site

---

[15] Further, unlike Plaintiffs' common law tort claims, the plaintiffs' claims in *Florida Wildlife* arose directly from the state statute administered by the agency, which provided that the agency is a necessary party to any citizen enforcement action. *Id.* at 1313. There is no comparable provision in the West Virginia Code, rendering *Florida Wildlife* inapplicable here.

contaminated by hazardous materials. 330 F.R.D. 435, 436–37 (E.D. Va. 2019). The court was asked to enter a judicial consent decree that settled the claims, which settlement recognized the responsibility of the Navy and Department of Defense ("DOD") for the contamination and thus provided for monetary payments from those agencies to parties that had incurred cleanup costs, including the Commonwealth. *Id.* The Navy and DOD were required parties because it was necessary to bind them as signatories to the consent decree and ensure that their obligations to the Commonwealth would be enforceable. Here, in contrast, Plaintiffs do not ask the court to provide *any* relief against WVDEP or bind the agency in any way, rendering *Atlantic Wood Industries* inapposite.

The district court thus correctly concluded that WVDEP is not a necessary party under Rule 19(a)(1)(B)(i). JA282–284; JA408–409.

### 3. *Granting Plaintiffs' Requested Relief Would Not Impose Inconsistent Obligations on Defendants.*

Defendants' argument that WVDEP is a necessary party under Rule 19(a)(1)(B)(ii) because granting Plaintiffs' relief would subject Defendants to a "substantial risk" of "inconsistent obligations" largely overlaps with their argument that the district court cannot afford adequate relief in WVDEP's absence. Def. Br. 41–44. It fails for the same reasons.

As explained above, Plaintiffs seek only money damages. They do not ask the court to order WVDEP to do anything, including to transfer operator status of

47

wells from Diversified to EQT. Defendants' claim that WVDEP would nearly certainly deny any application to plug the abandoned wells on Plaintiffs' properties—a claim that is notably absent from WVDEP's own brief—runs contrary to WVDEP's regulations, W. Va. Code St. R. § 35-4-13.8, and is, as the district court recognized, "mere speculation." *See* JA410.

Moreover, if Diversified's abandoned wells are plugged using money awarded to Plaintiffs, that will only ensure Diversified's compliance with the Consent Order. JA409–410; *Ohio Valley Env't Coal., Inc. v. Maple Coal Co.*, 808 F. Supp. 2d 868, 887–891 (S.D.W. Va. 2011) (declining to find WVDEP a necessary party despite the court's need to determine the legal effect of multiple agency orders and enforcement actions and explaining that, by requiring compliance with the defendant's permit limits on a faster schedule than required by the agency, plaintiffs would not create inconsistent obligations but rather ensure compliance with the agency's deadlines).

There is no conceivable way that WVDEP could "prohibit[] Defendants from obeying the district court's order," *see* Def. Br. 42, such that there is *no* risk, much less the required "substantial risk," that Defendants will be subject to inconsistent obligations. JA408–410. *See Coastal Modular Corp. v. Laminators, Inc.*, 635 F.2d 1102, 1107–08 (4th Cir. 1980) (refusing to find the Navy's absence

created a "substantial risk" of inconsistent obligations because the movant "could only theorize the possibility that the Navy would institute suit against it").

Accordingly, the district court did not abuse its discretion in refusing to find that WVDEP is a necessary party under Rule 19(a)(1)(B)(ii).

### III. The District Court Did Not Abuse Its Discretion When Refusing to Dismiss Plaintiffs' Claims Under Rule 19(b).

Because this Court should affirm the district court's well-supported and well-reasoned finding that WVDEP is not a necessary party under Rule 19(a), it need not address Defendants' Rule 19(b) argument, which is largely premised on the Supreme Court's indispensability analysis in *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008). *See Cachil*, 547 F.3d at 970 ("Because in our case the absent tribes are not required parties under Rule 19(a), we are unaffected by the Rule 19(b) analysis set forth in *Pimentel*."). Regardless, that analysis demonstrates that the district court acted well within its discretion when it determined that WVDEP's absence did not require dismissal of Plaintiffs' claims.

Rule 19(b) requires the Court to determine whether, "in equity and good conscience," an action should proceed in the absence of a necessary party. The 1966 Amendments to Rule 19 established an equitable balancing test to replace the "rigid thinking" that had turned "into a rather inflexible rule even going so far as to equate 'indispensable' with 'having a joint interest.'" *See Kamhi v. Cohen*, 512 F.2d 1051, 1053–54 (2d Cir. 1975). The term "indispensable" is thus only used in

49

the "conclusory sense" that the court in its discretion determines that in the absence of a necessary party "it would be *preferable* to dismiss the action, rather than to retain it." Fed. R. Civ. P. 19, Advisory Committee Notes to 1966 Amendment (emphasis added).

Rule 19(b) provides four non-exclusive factors for courts to consider in making that determination: (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties, (2) the extent to which any prejudice could be lessened or avoided by protective provisions in the judgment, shaping the relief, or other measures, (3) whether a judgment rendered in the person's absence would be adequate, and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder. Fed. R. Civ. P. 19(b). The first three of those factors have significant overlap with the analysis under Rule 19(a): "Impairment of the absent party's ability to protect its interest (19(a)(2)(i)) is similar to the prejudice to the absent party consideration under subsection (b); risk of leaving a defendant exposed to inconsistent obligations (19(a)(2)(ii)) is similar to the prejudice to the defendant factor under (b); and whether complete relief can be accorded (19(a)(1)) is similar to the adequacy of relief inquiry under (b)." *Northrop Corp.*, 705 F.2d at 1043 n.15.

Defendants attempt to do away with Rule 19(b)'s delicate balancing act, claiming that, under *Pimentel*, "WVDEP's sovereign immunity by itself requires

50

dismissal given that WVDEP is a necessary party." Def. Br. 56. But that is not the law. As the Federal Circuit held in *Gensetix v. Board of Regents of the University of Texas System*, a district court abuses its discretion when it attempts to "collaps[e] the multi-factorial Rule 19(b) inquiry into one dispositive fact: [the absent party's] status as a sovereign." 966 F.3d 1316, 1325 (Fed. Cir. 2020). "*Pimentel* . . . does not compel a different conclusion." *Id.* at 1326; *see also Hayes, Tr. for Paul B. Hayes Fam. Tr., Dated Apr. 30, 2010 v. Bernhardt*, 499 F. Supp. 3d 1071, 1079 (N.D. Okla. 2020) (weighing the four factors and finding that sovereign tribal entity was not an indispensable party, despite being a necessary party).

Looking to the first factor, neither WVDEP nor Defendants would suffer "serious prejudice" as a result of WVDEP's absence. *See Defs. of Wildlife v. Andrus*, 77 F.R.D. 448, 452 (D.D.C. 1978) ("[F]ederal courts have been very reticent to dismiss on the grounds of failure to join an indispensable party, except when *serious* prejudice or inefficiency will result." (emphasis added)); Fed. R. Civ. P. 19, Advisory Committee Notes to 1966 Amendment (requiring "immediate and serious" prejudice to support dismissal"). As explained above, Plaintiffs' claims are expressly preserved by West Virginia law and have no impact on WVDEP's

authority under the Consent Order.[16] *See* supra at 16–17, 40–44. Defendants assert that Plaintiffs' suit would prevent WVDEP from entering consent agreements with other operators, Def. Br. 48, but that unsubstantiated speculation does not withstand scrutiny. In fact, WVDEP has entered into *numerous* plugging agreements with other well operators since the filing of Plaintiffs' complaint in this action. *Pimentel*'s holding that "dismissal of the action must be ordered *where there is a potential for injury to the interests of the absent sovereign*," 533 U.S. at

---

[16] Those facts distinguish this case from the numerous cases cited by Defendants, all of which involve direct interference with concrete, legally-protected interests of a sovereign. *See, e.g.*, *Pimentel*, 553 U.S. 851 (determining the rights to specific property over which absent sovereign nation claimed ownership); *White v. Univ. of Cal.*, 765 F.3d 1010, 1028 (9th Cir. 2014) (determining rights to human remains over which absent tribe asserted ownership); *Sabine Pipe Line, LLC v. A Permanent Easement of 4.25 +/- Acres of Land in Orange Cnty., Tex.*, 327 F.R.D. 131, 144 (E.D. Tex. 2017) (seeking condemnation of land owned by absent state government); *Lee v. Anthony Lawrence Collection, L.L.C.*, 47 F.4th 262, 266 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 1054 (2023) (determining absent sovereign university's rights to a trademark over which it claimed ownership); *Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affs.*, 932 F.3d 843, 849 (9th Cir. 2019) (determining validity of authorizations for coal mine owned by absent tribe); *Two Shields v. Wilkinson*, 790 F.3d 791 (8th Cir. 2015) (determining whether absent sovereign agency breached fiduciary duty in issuing oil and gas leases); *N. Arapaho Tribe v. Harnsberger*, 697 F.3d 1272 (10th Cir. 2012) (determining whether certain land was "Indian country," which would dictate whether absent sovereign tribe could assert jurisdiction over it to the exclusion of the State of Wyoming); *A123 Sys., Inc. v. Hydro-Quebec*, 626 F.3d 1213, 1221 (Fed. Cir. 2010) (determining validity of patent over which sovereign university claimed ownership).

52

867 (emphasis added), thus has no application here, where there is *no* potential for injury to the interests of WVDEP.

Turning to the adequacy of the judgment in WVDEP's absence, as Plaintiffs explained supra at 32–36, the district court properly concluded that it could afford full relief among the parties because "Plaintiffs are not requesting this Court to order [WVDEP] to take any action or instruct the state agency and state officials on how to conform their conduct to state law." JA408. Therefore, the court concluded it "need not reject [WVDEP] and Diversified's Consent Order to vindicate plaintiffs' property rights." JA409; *see also Manygoats v. Kleppe*, 558 F.2d 556, 558–59 (10th Cir. 1977) (refusing to find absent tribe indispensable because the plaintiff's "requested relief does not call for any action by or against the Tribe").

The final factor—whether Plaintiffs would have an adequate remedy if the action were dismissed for nonjoinder—also weighs heavily in favor Plaintiffs, who bring their claims on behalf of thousands of West Virginia landowners who would be left without an adequate remedy if their tort claims were dismissed. As the district court observed, the WVDEP complaint procedure that Defendants cite, found at West Virginia Code Section 22-6-28(a), is "inadequate to fully address" Plaintiffs' claims in part because "damages recoverable in a tort action are broader than [the relief] available administratively." JA284–285; *see also* JA197–198

53

(explaining that under Section 22-6-8(a), Plaintiffs cannot obtain damages, cannot bring fraudulent transfer claims, cannot bring a class action, and cannot appeal any adverse decision).

These observations are fatal to Defendants' position. In its landmark case interpreting the 1966 Amendments to Rule 19, the Supreme Court's "first concern was the plaintiff's interest in having a forum." *Collins v. Gen. Motors Corp.*, 101 F.R.D. 1, 4 (W.D. Pa. 1982) (discussing *Provident Tradesman Bank and Trust Co. v. Patterson*, 390 U.S. 102 (1968)). Even where the absent party is a sovereign whose interests would be affected, this factor may "by itself support[] proceeding." *Hayes*, 499 F. Supp. 3d at 1079.

Accordingly, the district court acted well within its broad discretion in finding that the harm to Plaintiffs from dismissal outweighed any potential prejudice to Defendants. JA410.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's denial of Defendant's Rule 19 Motion.

Dated: December 20, 2023        Respectfully submitted,

                         */s/ John W. Barrett* _____

John W. Barrett, Esq.
Leslie A. Brueckner
J. Lincoln Wolfe
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555 (phone)
(304) 342-1110 (fax)
jbarrett@baileyglasser.com

*Attorney for Plaintiffs and Proposed Class*

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts of the document exempted by Rule 32(f), it contains 13,000 words. This Brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5), (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2017 in Times New Roman, 14 point.

*/s/ John W. Barrett*
John W. Barrett, Esq.

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 20, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ John W. Barrett*
John W. Barrett, Esq.